FILED

JUL 3 1 2017

JEAN CARTER-CIRCUIT CLERK
WOODRUFF COUNTY, AR

AT 3:53 P M

## IN THE CIRCUIT COURT OF WOODRUFF COUNTY, ARKANSAS

| | |
|---|---|
| WHITEHEAD FARMS and<br>KEVIN WHITEHEAD, on Behalf of Themselves<br>And Other Similarly Situated Arkansans,<br><br>Plaintiffs,<br><br>v.<br><br>MONSANTO COMPANY, BASF SE,<br>BASF CORPORATION, BASF CROP<br>PROTECTION, AND JOHN DOES 1 – 25<br><br>Defendants, | Case No. CV-2017-40 |

### CLASS ACTION COMPLAINT

COMES NOW Plaintiffs, Whitehead Farms and Kevin Whitehead, on behalf of themselves, all others similarly situated, and the class they seek to represent for their Complaint against the named Defendants herein, state:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this lawsuit.

2. Plaintiffs are residents and citizens of Woodruff County Arkansas and represent similarly situated injured persons.

3. At all relevant times herein, Defendants have jointly researched, designed, formulated, compounded, developed, tested, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised and

made representations regarding dicamba-resistant crops and dicamba herbicide.

4. This Court has personal jurisdiction over the parties. Defendants engage in continuous, systematic and continually conduct business in the State of Arkansas, avail themselves of the opportunity to conduct business in this State, sell products, market, advertise and distribute products in this State and have committed tortious acts in the State of Arkansas.

5. Venue is proper in this County where many of the actions complained of took place, and moreover, Plaintiffs reside in this County.

## PARTIES

6. Plaintiff K. Whitehead Farms, Inc. is in Arkansas corporation with its principal place of business located in Woodruff County, Arkansas.

7. Plaintiff Kevin Whitehead is an individual and member of K. Whitehead Farms, Inc.

8. Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its principal place of business in Missouri.

9. Defendant BASF Corporation is a Delaware corporation with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey. BASF Corporation is the affiliate, subsidiary, agent, distributor and North American agent for BASF SE, a German company (hereinafter jointly referred to as "BASF").

10. BASF cooperates and joint ventures with Monsanto in research, development and marketing of herbicides and weed control products, including Dicamba. In early 2009, Monsanto partnered with BASF, a German chemical company and the largest chemical producer in the world, and agreed to a joint licensing agreement to

accelerate the development of dicamba-based weed control products.

11. In the U.S., BASF Corporation, headquartered in Florham Park, New Jersey, is a wholly-owned and controlled American subsidiary of BASF SE, and manufactures several dicamba herbicides, including Banvel, Clarity, Distinct, Marksman, Status, and a forthcoming product, Engenia™.

12. Monsanto and BASF also have an established research and development collaboration to develop technologies for farmers - yet both companies intend to individually launch their own dicamba-based crop systems and herbicides.

13. In November 2010, Monsanto and BASF stated they recently completed field testing of the dicamba-based herbicides. In tests, the dicamba herbicides were applied over-the top to Monsanto's Xtend products at Monsanto's research facility in Monmouth, Illinois.

14. At least by 2012, weed scientists, agronomic crop growers, and specialty crop growers began warning consumers and growers alike of the danger of dicamba-resistant crops, including dicamba's propensity to drift onto sensitive, neighboring crops and how dicamba will accelerate the evolution of super weeds.

15. Also in 2012, Monsanto submitted its petition to the EPA to register dicamba for in-crop use with cotton.

16. In 2013, Monsanto submitted its application to deregulate dicamba for use with GM cotton.

17. In June 2014, BASF announced plans to boost production of its dicamba weed killers by fifty percent (50%) to keep pace with anticipated demand should Monsanto receive regulatory approval to sell its new GM soybean and cotton products.

18. Six months later, in January 2015, BASF's plan paid off when the USDA announced its decision (after a five-year investigation) to deregulate Monsanto's dicamba-tolerant crop technology for soybeans and cotton, authorizing the crops for unrestricted commercial planting.

19. On December 21, 2016, BASF secured EPA approval for its dicamba herbicide, Engenia TM, for use on dicamba-tolerant soybeans and cotton. Engenia ™ will be available for the 2017 growing season.

20. Entities or agents not named as Defendants have directly participated in the unlawful conduct and conspiracy alleged herein and have performed acts and made statements in furtherance thereof.

21. While actively engaged in the management, direction or control of its affairs, each of the co-conspirators performed each of the acts alleged herein, or alternatively, each co-conspirator authorized or ordered duly authorized officers, agents, employees or representatives to perform said acts.

22. Defendants are liable for unlawful acts performed in furtherance of the alleged conspiracy by companies acquired through mergers and acquisitions.

## FACTS

23. A useful and marketable herbicide must be capable of suppressing growth of undesirable plants without materially adversely impacting human health or the environment, including desirable, non-target crops and plants.

24. It is incumbent upon one who manufactures, formulates, packages or distributes a herbicide to be aware of its product's phytotoxic characteristics, both with regard to the target plants as well as potential off-target plants, and to take appropriate actions to ensure that off-target plants are not collaterally injured with its use.

25. Dicamba is an herbicide, often used to kill pigweed. It is known to have negative effects on certain crops, including soybeans and watermelons.

26. The dicamba-containing herbicides that were approved for use at all times relevant to this lawsuit were prone to drift.

27. Defendants knew those older dicamba-containing herbicides were prone to drift.

28. Monsanto designed, developed, marketed, distributed, and sold Round Up Ready 2 Xtend soybeans ("Xtend soybeans") and Bollgard II XtendFlex cotton seeds ("Xtend cotton") (collectively, "Xtend seeds"). Xtend seeds are currently resistant to the negative effects of dicamba-containing herbicides.

29. At the time Defendants began selling Xtend seeds, and at all times relevant to this lawsuit, Monsanto was not selling an EPA-approved dicamba herbicide that was not prone to drift.

30. Defendants marketed, distributed and sold Xtend seeds that contributed to the harm sustained by Plaintiffs.

31. Northeastern Arkansas is one area where soybeans and watermelons have been significant crops for decades.

32. Damage to off-target soybean and other crops has repeatedly been documented due to drift of dicamba-containing products in Arkansas, as well as other locations. The use of dicamba-containing products has been restricted or prohibited in many locations where sensitive crops are grown. The Defendants have therefore known, or should have known, of dicamba's lack of selectivity and its extreme phytotoxicity to desirable non-target plants, and therefore, of the potential for collateral harm through drift of dicamba-containing products if applied in proximity to such crops. Despite such

knowledge.

33. Defendants have continued to market and sell Xtend seeds to farmers in Northeastern Arkansas and failed to warn or instruct or otherwise limit the use of dicamba-containing products either geographically or temporally so as to reasonably assure that harm would not occur to other crops growing in the region.

34. Xtend seeds were approved for use by the Arkansas Plant Board.

35. Defendants did not receive approval for any dicamba-containing herbicide for use with Xtend seeds.

36. Nonetheless, Defendants encouraged farmers in Arkansas to plant Xtend seeds and use dicamba-containing herbicides made by companies other than Monsanto. Defendants took these actions, knowing that dicamba-containing products would cause injury to crops grown from seeds other than Xtend seeds.

37. The injury caused by exposure to dicamba-containing products resulted in financial losses to all Plaintiff farmers. The proximate cause of the injury was the defective design, marketing, selling, and misbranding of Xtend seeds and their lack of suitability for the particular purpose for which they were sold in the area in question during the timeframe involved and a lack of merchantability. Defendants were willful and negligent in their release, marketing, and selling of a defective crop system without an accompanying EPA-approved dicamba herbicide.

38. Defendants have common-law and statutory duties to give reasonable and adequate warning of dangers reasonably foreseeable in the use of their productions to others, as well as such instructions as may be needed to make it reasonably likely that such harm will be avoided if followed.

39. None of the labels for Defendants' products provide full, complete, and

accurate information about the extreme toxicity of dicamba-containing products. None of Defendants' labels contain directions for use that, if complied with, are adequate to protect the environment, including Plaintiffs' crops. Defendants' labels do not and never have contained warning or caution statements that, if complied with, are adequate to protect the environment, including Plaintiffs' crops.

40. The inherent, phytotoxic profile of dicamba-containing products cannot be applied with reasonable safety in northeastern Arkansas, using any typical or reasonably practical application techniques and conditions of use limitations, given the well-recognized nature and patterns of cultivation in that region, their regional proximity to one another, the foreseeable weather patterns in northeastern Arkansas and timing of likely application. Accordingly, the Xtend seeds are defective as inherently posing an irreducible, unreasonable risk of harm to crops grown in the region that are not resistant to dicamba.

41. Plaintiffs incurred damages to their crops as a direct and proximate result of the preparation, mixing and application, including but not limited to drift, of the chemicals described herein.

## CLASS ACTION ALLEGATIONS

42. Plaintiffs bring this action on behalf of themselves individually and as a class action pursuant to Arkansas Rules of Civil Procedure 23 on behalf of the following defined class (the "Class"):

> All citizens of Arkansas that farm lands within the State of Arkansas, and which have documented dicamba drift onto their farms. Excluded from the Class is any defendant, and any of its officers, directors, and/or employees.

43. Plaintiffs believe the approximate size of the Class to be in the hundreds

and so geographically dispersed throughout Arkansas that joinder of all class members is impracticable.

44. Plaintiffs' state law claims are typical of the claims of the Class and arise from the same unlawful conduct engaged in by the defendants. The relief sought by the Plaintiffs is common to the entire class.

45. Numerous questions of fact or law arise from Defendants' and their co-conspirators' unlawful conduct, which is common, overarching and predominating to the class, including but not limited to:

   a) Whether Defendants and their co-conspirators combined or conspired to control the non-dicamba-tolerant crop market and supply dicamba harmful to non-dicamba tolerant crops;

   b) Whether Defendants and their co-conspirators engaged in unfair, or unconscionable business practices;

   c) Whether Defendants and their co-conspirators were negligent by developing, marketing, and selling dicamba-resistant seeds without a safe, approved herbicide;

   d) Whether Defendants gave an adequate warning and instruction to purchasers and third-party purchasers of the dangers of dicamba-resistant seeds without a dicamba-based herbicide to be used in conjunction with one another;

   e) Whether Defendants had a legal duty to innocent parties, including Plaintiffs, to use ordinary care to protect them against the unreasonable risk of harm of the inevitable spraying of old, volatile dicamba-based herbicides that would protect dicamba-resistant seeds;

   f) Whether punitive damages should be imposed upon Defendants for

their conduct;

46. The questions of fact or law common to the Class are overarching and predominate as a threshold matter over any individual questions affecting members of the Class.

47. The Plaintiffs will fairly and adequately represent the interests of the Class and have no interest that is in conflict or antagonistic to the Class. Plaintiffs have retained counsel who are competent and experienced in agriculture, toxic torts, class action and complex litigation.

48. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the class as a whole.

49. A class action is procedurally superior to any alternatives for adjudicating the claims of the Plaintiffs and members of the Class. The claims of the members of the Class are small and can be consolidated into one lawsuit to decide the predominating issue of liability. Permitting this lawsuit to proceed utilizing the class mechanism will eliminate multiple litigation over the same common issues of fact and liability and the probability of and risk of inconsistent decisions establishing varying standards of conduct for the Defendants. Maintenance of the lawsuit as a class action will promote judicial economy, efficiency and fairness to all parties involved.

## COUNT I

### STRICT PRODUCTS LIABILITY
### (Ark. Code § 4-86-102)

50. Pursuant to Section 4-86-102 of the Arkansas Code, a supplier of a product is liable for harm to another person or his property if: (1) The supplier is engaged in the business of manufacturing, selling, or distributing the product; (2) The product was

supplied by him in a defective condition that rendered it unreasonably dangerous; and (3) The defective condition was a proximate cause of the harm to person or to property.

51. Each of the Defendants is engaged in the business of variously manufacturing, selling, and distributing Xtend seeds and is a "supplier" Xtend seeds for the purpose of Section 4-86-102 of the Arkansas Code.

52. Xtend seeds are a defective product that cannot be used in a safe manner that prevents injury to non-target crops. Each of the Defendants supplied Xtend seeds in a defective condition that rendered them unreasonably dangerous.

53. The defective condition of Xtend seeds was a proximate cause of the harm to Plaintiffs.

54. Each Defendant is strictly liable for all damages to each plaintiff proximately caused by Xtend seeds.

## COUNT II

## NEGLIGENCE

55. <u>Negligent Design</u>: Each of the Defendants has a duty to use ordinary care in the design and in the selection of the materials used in its products to protect those who are in the area of its use from unreasonable risk of harm. Given the toxicity of dicamba to certain crops, it was negligent to design, formulate, manufacture, and sell a dicamba-resistant seed in the subject area. Each of the Defendants, therefore, failed to use ordinary care in the design and selection of materials in its products. The negligent design and selection of materials was a proximate cause of the harm to Plaintiffs. Each of the Defendants is liable for all damages to each plaintiff proximately caused by its actions.

56. <u>Negligent Testing</u>: Each of the Defendants had a duty to test its products

alone and in combination with dicamba-containing products that each of the Defendants recommended be used in order to determine the extent to which drift would injure off-target crops, and to provide such instructions and take other appropriate measures as are necessary to prevent such drift injuries. Each of the Defendants failed to adequately test its products or to take appropriate steps to prevent such damage. Each of the Defendants' negligent testing was a proximate cause of the harm to Plaintiffs. Each of the Defendants is liable for all damages to each plaintiff proximately caused by its actions.

57. <u>Inadequate Warning, Instruction, and Training</u>: Defendants have a duty to give a reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of the product and to provide such instructions as are necessary to permit the reasonably safe use of the product.

58. Monsanto sold its Xtend cotton and soybean seeds to farmers knowing that without a safe, approved herbicide alternative that there was a significant risk that farmers would use unapproved herbicides to protect their crops.

59. Each of the Defendants violated its duty to give a reasonable and adequate warning of the dangers inherent and reasonably foreseeable in the use of their products, including the danger of causing significant and far-reaching off-target movement, migration and drift of dicamba-containing products in amounts that cause severe damage to crops other than those grown from Xtend seeds.

60. Likewise, none of the product labels contain instruction for use that would, if followed, make it possible to use the Xtend seeds with a reasonable expectation that harm to collateral non-target crops would not be harmed.

61. The inadequate warnings were a proximate cause of the harm to Plaintiffs. Each of the Defendants is liable for all damages to each plaintiff proximately caused by its

actions.

62. In addition to the foregoing negligence, the Defendants were negligent in distributing and selling Xtend seeds to the other Defendants without warning them of the impropriety of suggesting the use of dicamba-containing products without limitations or modifications to make its use reasonably safe or without agreed restrictions on the products use so as to avoid it being sold into an area at a time where harm to sensitive crops would be likely to occur.

63. The distributing Defendants were negligent in selling Xtend seeds in the subject area given that they knew or should have known that using dicamba-containing products posed an unreasonable risk of harm to nearby crops, given the physical proximity of the two crops, time of use, and the history of crop damage occurring in the area from the use of dicamba-containing products.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

64. Each of the Plaintiffs has sustained damage due to Xtend seeds.

65. Each Defendant knew that Xtend seeds would be used for the particular purpose of providing protection against dicamba-containing products.

66. Each Defendant knew that farmers and the applicators who apply herbicides on behalf of farmers rely on the Defendants' skill and judgment to encourage the use of a suitable herbicide for weed control that will not damage off-target crops northeastern Arkansas, including adequate instructions and limitations on use, thereby impliedly warranting the product to be suitable for that particular purpose.

67. Defendants' products as designed, manufactured and labeled, were not fit

for the particular purpose for which they were required in that the product as designed, formulated and labeled posed an inherent risk to crops being grown in the region and the product therefore reached the implied warranty rendering Defendants liable to Plaintiffs for their damages arising from such harm.

68. The unfitness of Defendants' products was a proximate cause of Plaintiffs' damages.

69. Plaintiffs are people whom Defendants would reasonably have expected to be affected by Xtend seeds.

## COUNT IV

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

70. A seller impliedly warrants that a product is merchantable at the time the product is sold. To be merchantable, a product must be fit for the ordinary purposes for which the product is used, and the product must be adequately labeled and must conform to any promises or affirmations of fact made on the container or label.

71. Each of the Plaintiffs has sustained damage due to exposure to Xtend seeds.

72. Each Defendant sold Xtend seeds, which were not merchantable in that the product as designed, formulated, and labeled posed an inherent risk to crops being grown in the region.

73. The unfitness of Defendants' products was a proximate cause of Plaintiffs' damages. Plaintiffs are people whom Defendants would reasonably have expected to be affected by Xtend seeds.

## COUNT V
## ARKANSAS DECEPTIVE TRADE PRACTICES ACT
## (Ark. Code § 4-88-101, *et seq.*)

74. Each of the Defendants is a "person" for the purposes of the Arkansas Deceptive Trade Practices Act pursuant to Ark. Code Ann. § 4-88-102(3).

75. Xtend seeds constitute a "good" within the meaning of Ark. Code Ann. § 4-88-102(6).

76. Pursuant to Arkansas Code Annotated section 4-88-108, it is unlawful for any person to use deception, fraud, or false pretense in, or to conceal, suppress, or omit material facts in connection with the sale or advertisement of goods, such as Xtend seeds.

77. Pursuant to Arkansas Code Annotated section 4-88-107(a)(1), it is unlawful for any person to knowingly make false representations as to the characteristics of goods, such as Xtend seeds.

78. Pursuant to Arkansas Code Annotated section 4-88-107(a)(10), it is unlawful in Arkansas to engage in an "unconscionable, false, or deceptive act or practice in business, commerce, or trade. "Further, pursuant to Arkansas Code Annotated section 4-88-107(b), "[t]he deceptive and unconscionable trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state."

79. Defendants engaged in unconscionable, false, and deceptive acts and practices in selling and labeling its product to imply that the product could safely be used in northeastern Arkansas, when each Defendant knew or should have known, if exercising ordinary care, that this was not the case.

80. Each Defendant also knew or should have known that the use of the product as labeled posed a risk to area crops that was beyond the control of the user, when following the label or other instructions including but not limited to preparation, mixing, and application.

81. Defendants' customers, including Plaintiffs and members of the Class, were subjected to suppression, concealment and omission of material facts as a product of collusive, unlawful efforts by Defendants to control the market and suppress, conceal and omit from Plaintiffs, and others similarly situation, that their products posed a risk to area crops that was beyond the control of the user, when following the label or other instructions.

82. As a result of Defendants' fraudulent concealment of their conspiracy and unlawful, unconscionable, false, fraudulent, unfair and deceptive conduct directed toward Plaintiffs, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the Class members have as a result of the wrongful and unlawful conduct alleged in this complaint.

83. Defendants' actions were unfair and unconscionable, and thus, in violation of the ADTPA.

84. Plaintiffs and the Class have suffered actual damages.

## COUNT VI

## CIVIL CONSPIRACY

85. Monsanto, in a scheme to improperly market and expand the sales of its defective Xtend crop system, conspired with purchasers of Monsanto's Xtend seeds for the purchasers to illegally spray dicamba on the Xtend seeds.

86. The object of the conspiracy was the unlawful marketing of Monsanto's

defective Xtend crop system, the protection of its Xtend seeds and crops through the illegal spraying of dicamba-containing herbicides on those seeds and crops and a proliferation of its Xtend seeds through marketing to corner the market for genetically modified soybeans and cotton such that farmers in Arkansas would have no choice but to purchase Monsanto's Xtend seeds or risk destruction to their non-dicamba tolerant crops.

87. Monsanto, through its agents and representatives, encouraged and directed its purchasers to illegally spray dicamba-based herbicides on the Xtend seeds to protect the seeds and crops.

88. Numerous purchasers of Monsanto's Xtend seeds did unlawfully spray dicamba-containing herbicides on the Xtend seeds in furtherance of the conspiracy, including but not limited to violations of state statutes and regulations governing pesticide use.

89. Monsanto's scheme to sell more Xtend seeds by harming those farmers that did not originally purchase the dicamba-resistant Xtend seeds caused severe and irreversible harm to the Plaintiffs' land, crops, and livelihoods.

90. The unlawful actions of Monsanto and the purchasers of its Xtend seeds resulted in extensive damages to Plaintiffs for which the defendants should be held liable.

## JURY TRIAL DEMANDED

91. Plaintiffs respectfully demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully ask this Court:

a) For an order certifying this lawsuit as a class action under ARCP 23, appointing counsel herein as class counsel and named Plaintiffs as class representatives.

b)   For a judgment for compensatory and actual damages in accordance with the proof at trial;

c)   For a judgment for punitive damages;

d)   For Plaintiffs' costs, expert fees, disbursements and attorneys' fees incurred in prosecuting this action as permitted by statute, common benefit fund, common fund doctrine or other permissible law or doctrine;

e)   For pre-judgment and post-judgment interest at the maximum lawful rate; and

f)   For such other relief as the Court deems just, necessary or proper.

Respectfully submitted,

STEEL, WRIGHT, GRAY, & HUTCHINSON, PLLC

*/s/ Alex T. Gray*
Alex T. Gray

Alex Gray, AR Bar. 2008127
   alex@swghfirm.com
Nate Steel, AR Bar. 2007186
   nate@swghfirm.com
Marshall Wright, AR Bar. 2001185
   marshall@swghfirm.com
Jeremy Hutchinson, AR Bar. 2006145
   jeremy@swghfirm.com
Scott Poynter, Of Counsel
   scott@poynterlawgroup.com
   AR Bar. 90077
400 W. Capitol Ave., Suite 2910
Little Rock, AR 72201
Ph: (501) 251-1587
Fax: (501) 244-2614